## HAINES & A. v. TUCKER & Co.

Defendants contracted to buy of plaintiffs 5,000 bushels of malt at a certain price, and to accept and pay for the same at the rate of 1,000 bushels per month. After the contract, plaintiffs purchased barley and malted it in sufficient quantities to supply defendants 1,000 bushels per month, and delivered malt to the defendants as fast as it was called for by them, which was less than 1,000 bushels in all during the first three months. After about three months, plaintiffs notified defendants that they were ready to deliver malt according to the contract, and requested them to accept, which they refused to do ;—*Held*, that such refusal being an unqualified renunciation of the contract by defendants, it was not necessary for plaintiffs afterwards to set apart and offer 1,000 bushels each month in order to entitle them to recover the actual damage occasioned to them by the breach. *Held*, also, that the fact that 1,000 bushels per month was not delivered or accepted during the first three months was not sufficient of itself to show an abandonment of the contract by the parties; but that such change in the rate of delivery, being acquiesced in by both parties, amounted to nothing more than a postponement of performance as to the balance; that under such circumstances the defendants were bound to accept the balance of the malt at the rate of delivery agreed upon, when required to do so by the plaintiffs. *Held*, that the measure of damages for not thus accepting would be the difference between the contract price and the market value of malt at the times when it ought to have been accepted.

ASSUMPSIT brought by Haines & Wallace against Tucker & Co., on following contract:

" Nov. 18, 1868. It is agreed between Haines & Wallace and Tucker & Co., that Haines & Wallace will sell 5000 bushels malt at two dollars and forty cents a bushel of thirty-four lbs., and $2\frac{1}{2}$ per cent. allowed for screenings. The malt to be delivered at the rate of 1000 bushels per month, at Haines & Wallace's malt-house — good sound malt.                    GEO. W. TUCKER, for Tucker & Co."

After this agreement, Haines & Wallace purchased 5000 bushels of barley, which was malted by them from time to time in quantities sufficient to supply to the defendants 1000 bushels per month; and they delivered malt to Tucker & Co. as fast as it was called for by them, to wit: November 28, $269\frac{24}{34}$ bushels ; December 5, 278 bushels ; January 13, 1869, 200 bushels; February, $229\frac{13}{34}$ bushels,—in all, $977\frac{3}{34}$ bushels; amounting, allowing for screenings, to $2,286.65, which was paid for by Tucker & Co., about the time of delivery. About the 25th of February, the plaintiffs notified the defendants that they were ready to deliver malt according to the contract, and requested them to receive the same at the rate of 1000 bushels per month, and the defendants refused to receive it; and from that time to the time limited by

the contract for the delivery, the plaintiffs were ready to deliver malt, at the time and in the quantities agreed upon, whenever the defendants should call for it. The plaintiffs propose to prove that, after the expiration of the time for the delivery of the malt, there being a larger quantity than the plaintiffs could use in their business, they sent to Boston and sold 1000 bushels of malt, to wit: 1869. October 6, $100\frac{9}{34}$ bushels @ $1.75, $175.25 ; October 12, 300 bushels @ $1.75, $525 ; October 26, 200 bushels @ $1.65, $330 ; November 12, 200 bushels @ $1.65, $330 ; December 10, 200 bushels @ $1.50, $300,— $1,660.25. Less commission, $41.50; freight, $41.19; discount for screenings, $41.50,—$124.19,—$1,536.06. The market price of malt was falling from about December, 1868, until after these sales were made. The remainder of the malt the plaintiffs used, from time to time, at their brewery.

It is agreed that the measure of damages to be paid by said defendants, if any, for breach of the contract to accept the malt, be determined by the court on the above state of facts : reserving the right to either party to go to the jury on any matter of fact that may be material.

*S. N. Bell,* for plaintiffs.

*C. R. Morrison,* for defendants.

LADD, J. By the case agreed, nothing is fairly before us except to ascertain the measure of damages to be paid by defendants for their breach of the contract to accept and pay for the malt.

Defendants' counsel have argued, however, quite at length, that, upon the facts stated, the plaintiffs cannot maintain their action. The argument, of course, implies that sufficient appears in the case to show how the question thus raised should be decided. Still there may, perhaps, be room for an ingenious doubt whether the refusal of defendants, on or about February 25, 1869, was understood by the parties to be an absolute refusal to accept any more malt under the contract, at any rate ; and it may not be fully admitted that both parties acquiesced in the departure from the letter of the contract as to the rate of delivery up to that time.

We shall not undertake to usurp the province of the jury ; but for the purpose of what we have to say shall assume that the case shows an absolute renunciation of the contract by defendants, February 25, of which plaintiffs had notice ; and that up to that time defendants had consented to receive the quantity of malt which was actually delivered to them, instead of 1,000 bushels per month as provided by the contract. If these assumptions are contrary to fact, they can be made right by a verdict. If they are true, however, we think the action can be maintained, and that the plaintiffs are entitled to recover such actual damage as resulted to them directly from defendants' refusal to perform.

It is said that the plaintiffs ought to have set apart 1,000 bushels of malt each month, and notified defendants that it was ready for them;

and, if we understand the argument rightly, it is claimed that this ceremony ought to have been gone through with on the 18th of each month, from the date of the contract until the end of the time within which it was to have been performed.

The reasons for requiring this to be done are not given, although it is said to rest upon reasons stronger than exist for requiring a separation and tender where a party seeks to discharge himself from liability on a note payable in specific articles, to be delivered at a certain time and place. We have sought for the reasons, but fail to find them.

In such cases enough must be done to pass the property. Here there is no pretence that the property passed. It was an executory contract, and everything depends upon the understanding of the parties. After the execution of the contract, the plaintiffs purchased 5,000 bushels of barley, which was malted by them from time to time in quantities sufficient to supply the defendants 1,000 bushels per month, and delivered the malt as fast as it was called for.

Defendants did not call for it, or accept it, so fast as they were bound to by the agreement, and plaintiffs did not insist that they should do so until February 25. At that time the plaintiffs did require of them that they should proceed in the performance of the contract according to its terms; and then they utterly refused to go on with it at all. Upon this state of facts, it is difficult to see, at least by the light of reason and common sense, what occasion there was to measure out and set apart for them specific malt to the amount of 1,000 bushels per month.

It seems to us entirely too clear for argument that no such useless and at the same time burdensome ceremony could be required. The malt was ready for defendants if they had been ready to take it, and that was enough, at least until it appears that the failure to deliver occurred through some fault or failure of plaintiffs. It would be hard to draw but one conclusion from the conduct of the parties up to February 25, namely, that both assented to the rate of delivery adopted. It does not appear that either objected to the conduct of the other, or required of the other anything that was not done. How, then, can either complain now of any failure or default of the other before that time?

This is, however, as already suggested, to some extent, an inference of fact; and if the defendants desire to go to the jury upon the question whether or not they consented to receive what they did receive, instead of 1,000 bushels per month from the time of the agreement until February 25, 1869, that course is probably open to them. But we think the jury should be instructed that, inasmuch as the plaintiffs were all the time ready to perform on their part, they must find such acquiescence by defendants, unless evidence is introduced to satisfy them that the defendants for that cause did in fact elect to rescind the contract, and that there was such a failure on the part of plaintiffs as justified their recision. Defendants cannot be permitted to take advantage of their own fault in the matter. If for their convenience or advantage the plaintiffs consented to waive the provision of the con-

tract as to the rate of delivery for the first three months, defendants cannot now be heard to say that the contract was thereby abrogated, or that they are discharged from their obligations under it, by the omission on the part of plaintiffs of an act which their own conduct rendered wholly unnecessary and vain.

Taking it for granted, then, that the contract had not been abandoned, rescinded, or changed prior to February 25, was it necessary for the plaintiffs, after that time, to measure out and set apart for defendants any specific malt?

Among all the authorities referred to by defendant's counsel, there is but a single case— *Clark* v. *Baker*, 11 Met. 186—which appears, so far as we have examined, to give any countenance to such a doctrine. In that case it was held that it is the duty of the seller of a cargo of corn in bulk, part of which is damaged, to separate the good from the bad, and offer the good to the buyer; and if he would hold the buyer to take all the good, he must make such separation and offer, although the buyer, after receiving part of the corn, positively refuses to receive *any more at any rate.*

All that is said on this point is comprised in a very few lines of the opinion of the court as delivered by DEWEY, J., and not a single authority is cited in support of the view there expressed. On the other hand, the great weight of authority, as well as reason and sound sense, is, that where one party to a contract wilfully refuses to go on and perform his part of it, the other need not do acts in performance of his part which are thus rendered wholly useless and nugatory.

In *Jones* v. *Barkley*, 2 Doug. 684, one of the concurrent acts to be performed was the execution and delivery of an assignment of an equity of redemption. The plaintiffs averred that they had offered to execute, and tendered an unexecuted draft of such an assignment, but that the defendant absolutely discharged the plaintiffs from executing the same, or any assignment or release whatever. The argument was that this was insufficient; that the plaintiffs ought to have done everything they engaged to do as far as was in their power, without any concurrence of the defendant; they might have executed a release, but, instead of doing so, they only tendered a draft of a release. Lord MANSFIELD, in delivering the judgment of the court, said, "If ever there was a plain case, I think the present is.   *   *   *   The question is, Was there a sufficient performance? The party must show he was ready; but if the other stops him on the ground of an intention not to perform on his part, it is not necessary for the first to go further, and do a nugatory act."

*Rawson & als.* v. *Johnson*, 1 East. 203, was an action to recover damages for the non-delivery of malt which the defendant had undertaken to deliver on request at a certain price; and it was held to be sufficient for the plaintiff in his declaration to aver such request, and that he was ready and willing to receive the malt and pay for it according to the terms of the sale, without averring an actual tender of the price. The remark with which Lord KENYON begins his opinion in that case will bear repeating in this. He says, " However technical rules are to

be attended to, and in some cases cannot be dispensed with, yet in administering justice we must not lose sight of common sense ; and the common sense of this case will not be found to militate against any rule of law."

In *Cort & a.* v. *The Ambergate Railway Co.*, 17 Q. B. 127, all the English cases bearing upon the matter under consideration were quite fully considered and discussed by the court and counsel. In that case the plaintiffs had entered into a contract to supply the defendants with 3900 tons of cast iron chairs, to be supplied from time to time, and paid for on delivery. They received and paid for a certain portion. Others were received at periods later than those specified, at the request of the company's agent; and finally the plaintiffs were directed not to supply any more, as the defendants had no occasion for them, and would not accept or pay for them. A large quantity of chairs were in consequence never manufactured or tendered.

Defendants' counsel argued that the plaintiffs were not prevented, by any act of defendants, from going on and completing the contract on their part; that mere notice by defendants that they would not accept the goods would not be prevention within the legal meaning of the word; that it was necessary to show some physical interference which rendered it impossible for the plaintiffs to go on.

But the court held that such notice is a prevention, though there be no other act of obstruction, and that the plaintiffs were entitled to recover such damage as would put them into the same position as they would have been if they had been permitted to complete the contract.

It was not argued or claimed, on behalf of defendants, that if their act *prevented* performance by the plaintiffs it would afterwards be necessary for plaintiffs to tender performance, or do any further act in execution of the contract.

In *Smith* v. *Lewis*, 24 Conn. 624, and 26 Conn. 110, it was held that a refusal of one of the parties to a contract, founded upon mutual and concurrent conditions, to perform his covenants, will excuse acts of mere formal preparation, as well as acts of strict performance by the other, if the refusal is the direct and reasonable cause of their omission. An examination of the facts in that case will show that the court went quite as far as in *Cort* v. *The Ambergate Railway Co.* And it will be observed that both these cases go very much further than it is necessary for us to go in this. Notice by the defendants that they would not accept, in the former, was held to excuse the plaintiffs not only from an offer or tender of performance, but from all the preparations that would be necessary to enable them to tender performance,— that is, from manufacturing the chairs. In the latter, which was an action for breach of a covenant to exchange real estate, it was held that conduct of one party which amounted to a refusal to perform, excused the other from continuing his preparations to perform by removing mortgages on the land he was to convey, providing himself with money which he was to pay according to the terms of the contract, and executing and tendering a deed of his own land, all these things being within his power to do had the defendant kept his agreement. See,

also, Com. Dig. Condition (L. 6), and the following cases cited in Sharswood's note to *Cort* v. *Railway Co. supra* (79 C. L. Rep. 149) ; *Costigan* v. *Mohawk Railroad Co.*, 2 Denio 609 ; *Howard* v. *Wilmington Railroad Co.*, 1 Gill 311 ; *Risinger* v. *Cheney*, 2 Gilman 84 ; *Little* v. *Mercer*, 9 Missouri 218 ; *Groves* v. *Donaldson*, 15 Penn. St. Rep. 128 ; *Kugler* v. *Wiseman*, 20 Ohio 361.

In this case it appears that, from the time of the notice to the time limited by the contract for the delivery, the plaintiffs were ready to deliver malt at the time and in the quantities agreed upon, whenever the defendants should call for it; and the objection is, that they did not measure out, set apart, and offer 1,000 each month to the defendants until the whole 5,000 bushels had been measured over. Upon the doctrine of the well considered cases above referred to, it was not even necessary, after a refusal by defendants, that plaintiffs should any longer hold themselves ready to perform, much less could it be necessary for them to go through the form of offering what defendants had already once refused.

If on the trial the jury should find that the refusal of defendants on the 25th February did not amount to a renunciation of the contract by them ; and that what occurred on that day, together with defendant's previous conduct, was not sufficient to justify the plaintiffs as reasonable men in the conclusion that defendants did not intend to fulfil, and would not do so, then it would be necessary for plaintiffs to hold themselves in readiness to perform, and a further offer of performance might, perhaps, have been required. But assuming, as we do, that the defendants at that time " declared off," and refused to proceed in the execution of the contract by accepting and paying for any more malt, we think the plaintiffs were excused from any further offer, and from setting apart any specific malt for defendants after that time.

The contract was for the sale of a quantity of malt. It is suggested by plaintiffs' counsel that this contract implies that grain was to be malted ; that so it was an undertaking by defendants to accept and pay for an article to be, in effect, manufactured to order by plaintiffs, and therefore that they are entitled to recover the full contract price as though the malt had been delivered. We think the facts shown by the case do not warrant that position. If it appeared that the plaintiffs had expended time and labor or incurred expense in making preparations to fufil their contract, and that such outlay must have been in the reasonable contemplation of the parties when they made the contract, and then the plaintiffs were prevented from going on by the refusal of defendants to perform on their part, so that the labor and expense thus incurred were lost, those facts should of course go to the jury, because they would show an important part of plaintiffs' actual damage. But the case before us, as stated, does not show any such facts ; nothing appears to distinguish it from the ordinary contract for the sale of goods which have an ascertainable market value. However the fact may be, the case does not show any loss to plaintiffs by way of preparations to fulfil their contract which will not be compensated by the application of the ordinary rule where the vendee refuses to accept goods which he has contracted to buy.

Upon the refusal of defendants to accept, the plaintiffs might at their option, within a reasonable time, have given notice to defendants and sold the property, either at auction, or in such way as to be able to show that it sold for a fair price; and the price thus obtained, deducted from the contract price, would furnish the usual measure of damages. This was not done. It will therefore be necessary to ascertain the market value; and then, we think, the proper measure of damages will be the difference between the contract price and such market value.

It appears that the market price of malt was falling from about December, 1868, until the sales in Boston were made by plaintiffs in the fall of 1869. It becomes necessary, therefore, to consider at what time the difference between the contract and market prices shall be taken in fixing the damages. The defendants notified plaintiffs that they should not go on with the contract, about February 25, 1869. Such notice, however, could not have the effect to annul or abrogate the contract, or discharge them from any liability they had assumed under it. The legal obligation they thus discarded was a promise to receive and pay for 1,000 bushels of malt per month, at the agreed price, until the balance of the 5,000 bushels was delivered; and the plaintiffs are entitled to recover indemnity for their refusal to accept, in the manner and at the times agreed on.

In *Phillpotts* v. *Evans*, 5 Mees. & Wels. 475, a contract was made, early in January, to supply a quantity of wheat, " to be delivered at Birmingham as soon as vessels could be obtained; " and on the 26th of January, defendant gave notice to the plaintiffs that he would not accept it if delivered. It was at that time on its way to Birmingham; and on its arrival there the defendant was required to accept it, and refused, upon which the action was brought. The question was, whether the damages should be calculated according to the market price on the 26th of January, when the notice was given, or the price on the last day when the contract could have been completed, viz., when the wheat was tendered for acceptance. The latter was held to be the proper rule. Lord ABINGER, C. B., said, " The proper period at which to calculate the damages was when the defendant ought to have received the goods. The original contract was in no way modified by the notice, and the plaintiffs were not bound then to sell in order to reduce the damages." And PARKE, B., said, " The notice amounts to nothing until the time when the buyer ought to have received the goods, unless the seller acts on it in the mean time, and rescinds the contract." To the same effect are *Boorman* v. *Nash*, 9 Barn. & Cress. 145; *Stewart* v. *Cauty*, 8 Mees. & Wels. 160; *Dana* v. *Fiedler*, 12 N. Y. 40. See, also, *Orr* v. *Bigelow*, 14 N. Y. 556; *Ballentine* v. *Robinson*, 46 Penn. St. R. 177; Mayne on Dam. 79.

No other rule could be adopted consistently with the rule in actions by vendee against vendor for not delivering goods at the time specified in the contract, which is well settled, both in England and the United States, to be the difference between the contract price and the market value of the article at the time when it should have been delivered. Sedgw. on Dam. 260, and cases in note.

With these views upon the case stated, we think the plaintiffs are entitled to recover the difference between the contract price and the market value of the malt, that is, what it could have been sold for at the time the defendants were bound by the contract to receive it. This would be at the rate of 1,000 bushels each month after the demand, until the balance of the 5,000 bushels is covered by the estimate.

We think, by a fair construction of the contract, each party was entitled to the whole month in which to perform it, as to each 1,000 bushels, so that neither could sue the other for a failure as to any 1,000 bushels until the expiration of the month during which it was to be delivered and accepted. We therefore conclude that when the plaintiffs demanded performance, February 25, the defendants were entitled to the time from that day to March 18 to accept and pay ; and, inasmuch as strict performance had been waived up to that time by both parties, the plaintiffs were not then bound to deliver nor the defendants to accept but 1,000 bushels, and so as to each succeeding month.

The estimate of damages, then, should be made by taking the difference between the market value and the contract price of 1,000 bushels of malt on the 18th day of each month succeeding February, 1869, until the undelivered balance of the 5,000 bushels is exhausted. That would be 1,000 bushels, March 18 ; 1,000 bushels, April 18 ; 1,000 bushels, May 18 ; 1,000 bushels, June 18. And as to the remaining $22\frac{31}{34}$ bushels, the same calculation is to be made on the market price for July 18th.

As has been already intimated, the evidence of sales of part of the malt, made in Boston many months after the contract should have been fully performed, without notice to the defendants, is not admissible to lay the foundation for a claim to recover the difference between the price thus obtained and the contract price. If it can be received at all, it will only be as evidence tending to show the market value of malt at the time the contract was broken, that is, during the months succeeding February in which the defendants were under obligation to receive it. Whether it can be received for that purpose we do not now decide, as that is a question which can be much better determined at the trial; and with the foregoing suggestions, it will not be likely to present any difficulties that will embarrass the parties or the court.

                                       *Case discharged.*